# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                             |   |               |
|-----------------------------|---|---------------|
| JOYCE E. HOLMES,            | : |               |
| Plaintiff,                  | : | CIVIL ACTION  |
|                             | : |               |
| v.                          | : | NO. 05-5214   |
|                             | : |               |
| JO ANNE B. BARNHART,        | : |               |
| Commissioner of Social Security, | : |          |
| Defendant.                  | : |               |

# Memorandum and Order

YOHN, J.                                    November ___, 2006

Plaintiff Joyce E. Holmes appeals the decision of the Commissioner of Social Security

("the Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II

of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433.  Holmes and the Commissioner

have filed cross motions for summary judgment.  I referred the motions to the magistrate judge,

who submitted a report and recommendation that I grant the Commissioner's motion and affirm

the Commissioner's decision.  Holmes has filed objections to the report and recommendation.

The Commissioner did not file a response.  For the following reasons, I will remand this matter

to the administrative law judge ("ALJ") for further consideration.

## I.  Procedural Background

On December 13, 1996, Holmes filed an application for DIB alleging disability stemming

mainly from neck and back problems she had experienced since May 13, 1996.  (R. 234-39.)

The application was denied initially and upon reconsideration.  (*Id*. at 205-06, 217-19, 222-24.)

Subsequently, Holmes filed a request for a hearing before an ALJ (*id*. at 225), which was held on November 2, 1998 (*id*. at 54).  Holmes, who was represented by an attorney, and Phyllis Wallace, a close friend of Holmes, testified at the hearing.  (*Id*. at 54-90.)  On August 19, 1999, the ALJ issued an unfavorable decision.  (*Id*. at 211-15.)  Holmes appealed this decision to the Appeals Council on September 19, 1999.  (*Id*. at 229.)

On July 11, 2000, Holmes protectively filed a second application for DIB based on the same allegations found in her initial application.  (*Id*. at 437-40, 459, 473-74.)  On February 16, 2001, the Social Security Administration this time issued a favorable decision finding Holmes had been disabled, but only found disability since August 20, 1999, the day after her original application was denied.  (*Id*. at 391.)

On August 26, 2002, the Appeals Council vacated the unfavorable decision issued on August 19, 1999, reopened the favorable decision issued on February 16, 2001, consolidated both cases, and remanded the matter to an ALJ for a new a hearing.  (*Id*. at 231-33, 393-95.)  An ALJ held a new hearing on June 13, 2003.  (*Id*. at 91-131, 396.)  At that hearing, Holmes and Wallace again testified.  (*Id*. at 95-125.)  In addition, Gary Young, a vocational expert ("VE"), testified.  (*Id*. at 126-130.)  The ALJ issued an unfavorable decision on July 11, 2003.  (*Id*. at 401-11.)  In response to Holmes' request for review of this decision (*id*. at 415-16, 420-23), the Appeals Council vacated it and remanded the case to a different ALJ for another hearing to, among other things (*id*. at 427), evaluate Holmes' obesity, reconsider her functional capacity, and address "the evidence which was submitted with the request for review (*id*. at 428)."

On May 19, 2004, the new ALJ held a hearing.  (*Id*. at 144-92.)  Holmes and Wallace testified for the third time.  (*Id*. at 144-80.)  William Hausch, Ph.D., a VE, and Stanley Askin,

M.D., a medical expert ("ME"), also appeared and testified.  (*Id*. 181-92.)  The ALJ issued an

unfavorable decision on August 5, 2004.  (*Id*. 33-44.)  The ALJ concluded that Holmes'

impairments did not prevent her from performing her past relevant work, and therefore she was

not disabled at any time during the relevant time period as defined by the Act.  (*Id*.)

Holmes again requested review of the ALJ's decision by the Appeals Council.  (*Id*. at 11-

19, 31-32.)  This request was denied on August 3, 2005 (*id*. at 6-10), and therefore the

unfavorable decision issued on August 5, 2004 became the final decision of the Commissioner.

Thereafter, Holmes filed the instant action seeking review of the Commissioner's decision that

she was not entitled to DIB from May 13, 1996 to December 31, 2001.  Both parties then filed

motions for summary judgment, and thereafter this court referred the matter to a magistrate judge

for a report and recommendation.  On August 14, 2006, the magistrate judge issued a report and

recommendation that the Commissioner's motion for summary judgment be granted and Holmes'

motion be denied.  (Rep. & Recom. 31.)  Holmes filed objections to the report and

recommendation.  The Commissioner has not filed a response.

**II.  Factual Background**

Holmes, born on January 19, 1953, was forty-five years old at the time of her first hearing

before an ALJ.  (R. 57.)  Holmes testified that she is approximately five feet and six inches tall

and weighs about 215 pounds.  (*Id*. at 58.)  She further testified that she is married and does not

have any children.  (*Id*.)  Holmes completed high school, and has relevant past work experience

as an authorization clerk, distribution clerk, and encoding operator.  (*Id*. at 59-62, 261-64.)

However, she testified that she stopped working in May of 1996 because of upper body pain and

confinement to bed.  (*Id*. at 59, 62.)  Holmes also testified that she was taking Soma, Motrin, and some type of blood pressure pills.  (*Id*. at 64.)

The following summarizes the reports of health professionals who treated or examined Holmes.  Henry Sadek, D.O., Holmes' primary care physician, treated Holmes from July 23, 1994 to May 29, 2003.  (*Id*. at 343-47, 358-72, 499-500, 502-05, 515-27.)  On April 14, 1997, Dr. Sadek diagnosed Holmes with multi-level cervical degenerative joint disease ("DJD"), bulging of the C3 to C6 discs, moderate hypertension, and lumbar strain.  (*Id*. at 344.)  Further, Dr. Sadek concluded that Holmes suffered from chronic disabling pain.  (*Id*. at 346.)  However, Dr. Sadek reported that Holmes did not require any assistive device and possessed nearly normal motor power and sensation.  (*Id*. at 345.)  Dr. Sadek directed Holmes to take Motrin and undergo acupuncture and heat massages to relieve her pain (*id*. at 344), and prescribed Cardizem for her hypertension (*id*. at 360).  According to Dr. Sadek, Holmes responded poorly to this treatment.  (*Id*. at 346.)  In October of 1996, Dr. Sadek opined that Holmes could lift and carry only five pounds, could not stand or walk, could sit for three hours, and could not move her neck at all.  (*Id*. at 361-63.)

On September 22, 1998, Dr. Sadek reported symptoms of periodic pain and weakness in the neck and back, reduced reflexes of both arms and legs, and numbness in the right arm.  (*Id*. at 368.)  Dr. Sadek reported that the pain appeared to radiate to Holmes' arms and legs.  (*Id*.)  Further, Dr. Sadek reported that Holmes had difficulty in walking on her heels and toes, hopping, bending, squatting, dressing, and getting on and off the examining table.  (*Id*. at 369.)  However, even in light of these observations, Dr. Sadek again found that Holmes did not have a need for an assistive device.  (*Id*.)  Dr. Sadek reaffirmed his opinion that Holmes could not lift or carry any

4

weight above ten pounds, could not stand or walk, and could sit for three hours.  (*Id*. at 371.)

Dr. Sadek provided a residual functional capacity statement on May 29, 2003.  (*Id*. at 517-25.)  Dr. Sadek stated that Holmes' pain and fatigue virtually incapacitate her.  (*Id*. at 518.)  Further, Dr. Sadek reported that the cervical and lumbar MRI produced positive findings.  (*Id*.)  Dr. Sadek opined that Holmes needed four hours of rest at unpredictable times throughout a work day as a result of her pain and fatigue.  (*Id*. at 521.)  Dr. Sadek also opined that Holmes could not walk a full block due to her pain and fatigue, could not stand, could not bend or twist, could not continuously sit for more than twenty minutes, and should use a cane for assistance.  (*Id*. at 521-23.)  In addition, Dr. Sadek opined that Holmes could never lift ten pounds or more.  (*Id*. at 523.)  Dr. Sadek, who is not a neurologist nor a psychiatrist, diagnosed Holmes with depression, somatoform disorder,[1] and personality disorder.  (*Id*.)  Although Dr. Sadek asserted that the symptoms were consistent with medical signs and findings, he failed to provide any explanation of his assertion as directed by the residual functional capacity form.  (*Id*.)  In conclusion, Dr. Sadek opined that Holmes could not work at all.  (*Id*. at 524.)

Holmes was also treated by Robert Hudrick, D.O.  (*Id*. at 323-42.)  Dr. Hudrick treated Holmes from June 9, 1994 to April 11, 1997.  (*Id*.)  Dr. Hudrick recorded Holmes' height at five feet and six inches, and that her weight had increased from 200 pounds to 220 pounds since the first to last date of her treatment.  (*Id*. at 324, 334.)  Dr. Hudrick diagnosed Holmes with DJD,

---

[1]"The common feature of Somatoform Disorders is the presence of physical symptoms that suggest a general medical condition (hence, the term *somatoform*) and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder (e.g., Panic Disorder)... [T]here is no diagnosable general medical condition to fully account for the physical symptoms."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 485 (4th Ed. 2000).

occasional palpitations, and hypertension with no end organ damage. (*Id.* at 329.) Dr. Hudrick stated that the hypertension could be controlled with medication. (*Id.*) Further, he found Holmes had a normal gait and was neurologically normal except for her right upper extremity, which he found to have nearly normal motor strength.[2] (*Id.*)

Martin Goldstein, D.O., a neuropsychiatrist, examined Holmes on March 22, 1999. (*Id.* at 382-85.) Dr. Goldstein reported that Holmes was very obese, weighing 230 pounds. (*Id.* at 382.) During the examination, Holmes told Dr. Goldstein that she could shop, do light cooking, dust, and load the washer. (*Id.*) Dr. Goldstein reported that Holmes had normal muscle strength, a wide and waddling gait due to obesity, and neck discomfort. (*Id.* at 382.) In addition, Dr. Goldstein found that Holmes could write, pick up a coin, and turn a doorknob. (*Id.*) Holmes could also reportedly get on and off a chair without the need of an assistive device and, for the most part, dress and undress herself. (*Id.* at 383.) Dr. Goldstein's report further states that Holmes experienced occasional back pain when performing postural activities such as bending, kneeling, stooping, couching, balancing, and climbing. (*Id.* at 384.) The report provides that Holmes had no limitations with regard to physical functions such as reaching, handling, fingering, and feeling. (*Id.*) Dr. Goldstein opined that Holmes, while restricted to environmental conditions without vibrations and extreme temperatures (*id.*), could frequently lift ten pounds, occasionally lift twenty pounds, frequently carry two to three pounds, and occasionally carry twenty pounds (*id.* at 385). Dr. Goldstein further opined that Holmes could sit for one to two hours, walk or stand for less than six hours, and operate hand or foot controls without limitation

[2]Dr. Hudrick rated Holmes right upper extremity motor strength a four out of five (4+/5), five being normal. (R. 329.)

6

other than that previously stated for lifting and carrying.  (*Id*.)  Dr. Goldstein diagnosed Holmes

with "degenerative and bulging discs in the cervical and lumbosacral spine with resultant back

pain, great obesity with resultant back pain, [and] adjustment disorder."  (*Id*. at 383)  He

recommended Holmes begin a weight-reducing diet to take the pressure off her spine.  (*Id*.)

Aside from the aforementioned physicians, the other relevant physicians to actually

examine Holmes were Reina Marino, M.D., who examined Holmes and performed a MRI of her

cervical spine on August 1, 1996 (*id*. at 306-07), and Robert Goren, M.D., who provided a MRI

report dated September 9, 2003 (*id*. at 489-90).  Dr. Marino found multilevel "mild disc bulges

with prosterior osteophy formation which causes impression of the thecal sac. most significantly

at the C4-5 level."  (*Id*. at 307, 490.)  On June 12, 1997, Dr. Marino again examined Holmes and

performed another MRI.  (*Id*. at 298.)  Dr. Marino reported that "there is no evidence of disc

bulge or herniation," and found that "degenerative changes involve the facet joints at L5-S1, right

greater than left," with a possible enlarged uterus.  (*Id*. at 498.)  Dr. Goren examined an MRI of

Holmes' lumbar spine and wrote a report on September 9, 2003.  (*Id*. at 24.)  However, the report

fails to indicate when the MRI on which it was based was performed.  (*Id*.)  Dr. Goren reported

"facet joint osteoarthrosis that is quite prominent on the right" at the L5-S1 disc.  (*Id*.)  Further,

he reported that "the L5-S1 disc is slightly desiccated but otherwise normal."  (*Id*.)

The only remaining medical professional to examine Holmes during the relevant period

was Lisa Giordano, a physical therapist.  (*Id*. at 491-97.)  Giordano performed a functional

capacity examination on Holmes in May of 1997.  (*Id*.)  Giordano opined that Holmes could sit

for approximately one hour and stand for approximately fifteen to twenty minutes.  (*Id*. at 491.)

In addition, Giordano reported that Holmes was physically limited secondary to DJD and that she

"performed below sedentary level for physical demand characteristics of work, for lifting, carrying and pulling."  Giordano concluded that Holmes was unable to return to her previous job. (*Id*. at 492.)

Several physicians examined Holmes' medical records.  Dewey Nelson, M.D., a neurologist, provided his opinion on November 14, 1998 (*id*. at 373-76), and on March 6, 2003 (*id*. at 386-89).  In the November 14, 1998 opinion, Dr. Neslon concurred with Holmes' physicians on the diagnoses of moderate hypertension with no end organ failure, lumbar strain, and cervical pain without proof of radiculopathy.  (*Id*. at 374.)  Dr. Nelson found that Holmes' condition did not meet or equal Listing 1.05, but recommended a neurological evaluation (*id*. at 375-75), which was performed by Dr. Goldstein on March 22, 1999 (*id*. at 381-85).  In his March 6, 2003 opinion, Dr. Nelson concurred with the diagnoses of neck and spine pain, bulging cervical discs at C4-C6, L5-S1 spondylosis, and obesity.  (*Id*. at 387-88.)  However, Dr. Nelson found that the spondylosis did not meet or equal a listed impairment under Listing 1.04 (*id*.), and stated that a majority of people have bulging discs (*id*. at 388).

Henry Scovern, M.D., also examined Holmes' medical records.  Dr. Scovern found: 1) Holmes' imaging studies were non-diagnostic; 2) no convincing signs of radiculopathy or physical examination evidence of significant work-related impairments; 3) Holmes relied mainly on treatment which is not generally accepted by the medical community (acupuncture and electrical stimulation); 4) Holmes used only Motrin for her pain; and 5) the functional capacity test dated May 2, 1997 by the physical therapist was "essentially subjectively based and contained ample evidence of embellishment."  (*Id*. at 514.)

Lastly, Stanley Askin, M.D., an orthopedic surgeon, examined Holmes' medical records

8

and testified as a ME at her hearing on May 19, 2004. (*Id*. at 181-89.) Dr. Askin found no

difference in Holmes' medical condition from 1996 to the date of the hearing. (*Id*. at 185-85.)

Dr. Askin agreed that Holmes suffered from obesity, but did not find that it equaled a listing. (*Id*.

at 382-83.) Although Dr. Askin opined that Holmes' obesity would equal a listing if she suffered

from mild knee-arthritis, he found no objective documentation nor any imaging studies indicating

any sign of arthritis. (*Id*.) Dr. Askin found that the degenerative changes in Holmes' neck and

back were complicated by her obesity, and that this was a severe impairment. (*Id*. at 183.) Dr.

Askin testified, based on the medical records, that he believed Holmes' condition could

reasonably produce the pain from which she asserted suffering. (*Id*. at 185-86, 189.) Despite his

belief of Holmes' pain, Dr. Askin testified that Holmes' pain did not limit her from performing

light work. (*Id*. at 184-87.) Rather, he believed that such activity, although painful, would

gradually improve Holmes' condition. (*Id*.) In fact, Dr. Askin stated that not working would

worsen Holmes' condition. (*Id*.) Dr. Askin believed that Holmes' ability to work was simply a

question of subjective pain tolerance. (*Id*.) Dr. Askin thus concluded that there was no medical

reason why Holmes could not perform sedentary work. (*Id*. at 186.)

Subsequent to the hearing held on May 19, 2004, the ALJ issued the decision presently

under review by this court. In that decision, the ALJ found that Holmes was not engaged in

substantial gainful activity since the onset of disability, and that her cervical spine, lumbar spine,

and obesity were severe impairments based on 20 C.F.R. § 404.1520(c). (R. 43-44.) However,

the ALJ found that these impairments did not meet or equal one of the listed impairments on or

before December 31, 2001.[3] (*Id*. at 44.) Next, the ALJ determined that Holmes' claims and

---

[3]Holmes was insured for disability benefits only through December 31, 2001.

testimony were not completely credible, and that Holmes had the following residual capacity: "she could lift, carry, and pull up to [ten] pounds at a time and small objects frequently, walk or stand for up to two hours per workday, and sit for up to six hours per workday so long as she had the option to sit or stand periodically."  (*Id.*)

## III.  Legal Standards

I review *de novo* the parts of the magistrate judge's report to which Holmes objects.  28 U.S.C. § 636(b)(1)(C).  I may accept, reject, or modify, in whole or in part, the magistrate's findings or recommendations.  *Id.*

In contrast, a district court may not review the Commissioner's decision *de novo*.  The court may only review the Commissioner's final decision to determine "whether that decision is supported by substantial evidence."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  "[S]ubstantial evidence is more than a mere scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation omitted).  "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  In making this determination, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding."  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  The substantial evidence test is "deferential."  *Id.*  Consequently, the court "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently."  *Hartranft*, 181 F.3d at 360.

Before a district court can review the record to determine if the Commissioner's final decision is supported by substantial evidence, the Commissioner must provide an explanation for his findings in order to allow for meaningful judicial review. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 1981) (holding that an ALJ must "set forth the reasons for his decision"). The ALJ cannot simply state a conclusion "without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning." *Burnett*, 220 F.3d at 119-120. The Third Circuit has stated that "we need from the ALJ not only an expression of the evidence [he] considered, but also some indication of the evidence which was rejected" in order to determine "if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d 700, 705 (3d Cir. 1981). Without such information, the ALJ's findings are "beyond meaningful judicial review." *Burnett*, 220 F.3d at 119; *see also Cotter*, 642 F.2d at 705-06. Without the ability to meaningfully review the ALJ's conclusions, a court is compelled to "vacate and remand the case for a discussion of the evidence and an explanation of the reasoning supporting" those conclusions. *Burnett*, 220 F.3d at 120.

To determine if a claimant is disabled, the Commissioner applies a five-step process of evaluation under 20 C.F.R. § 404.1520. The first two steps of the analysis involve threshold determinations whether the claimant is working, 20 C.F.R. § 404.1520(a), and whether the claimant's impairment is of required duration and severity to significantly limit his or her ability to work, 20 C.F.R. § 404.1520(c). The third step is comparing the evidence of medical impairment against a list of impairments that would permit the claimant to qualify for disability without further inquiry. 20 C.F.R. § 404.1520(d). If the claimant does not qualify for benefits automatically according to this list, the Commissioner proceeds to the fourth and fifth steps of

11

the analysis.  In the fourth step the Commissioner determines whether the claimant retains the residual functional capacity to perform work similar to that he or she has performed in the past. 20 C.F.R. § 404.1520(e).  In the fifth and final step, if the Commissioner finds that the claimant is unable to perform any other work that exists in the national or regional economies, she must find the claimant to be disabled.  20 C.F.R. § 404.1520(f); *see also Sullivan v. Zebley*, 493 U.S. 521, 525 (1990) (expounding on the application of this five-step process).

## IV.  Discussion

Holmes' objections to the report and recommendation assert that the magistrate judge erred in finding that the ALJ: 1) properly evaluated Holmes' obesity at steps three and four; 2) accorded the proper weight to the records of examining and treating health professionals; 3) appropriately relied on the ME's testimony at step four; 4) properly evaluated Phyllis Wallace's testimony; and 5) followed the January 9, 2004 order of the Appeals Council.  Notably, Holmes does not raise any objections to the ALJ's analysis under steps one and two of the Commissioner's guidelines.  The Commissioner argues that the ALJ's finding that Holmes could return to her past relevant work is supported by substantial evidence in the record and therefore must be affirmed.

After reviewing the record, the court concludes that the ALJ applied incorrect legal standards and provided an inadequate explanation of the reasons for some of her findings. Specifically, the court concludes that the ALJ provided an inadequate basis for not according full weight to the opinions of the treating physicians, Dr. Sadek and Dr. Goldstein.  Further, the court also finds that the ALJ erred by relying on an improper standard to evaluate the testimony of the

ME, which may have influenced the ALJ's assessment at step four with regard to Holmes' residual functional capacity.  In addition, this court finds that the ALJ did not properly address Holmes' obesity in step four of her analysis.  Finally, the ALJ failed to address all of the evidence presented by Holmes as directed by the Appeals Council, specifically the September 9, 2003[4] report examining a MRI of Holmes' lumbar spine.  Therefore, I will remand this matter to the ALJ for further proceedings consistent with this memorandum & order.

**A.  Records of Treating and Examining Health Professionals**

Holmes, in her second objection, argues that the magistrate judge erred in finding that the ALJ properly determined the weight to be accorded to the records from treating and examining health professionals.  Holmes asserts that the ALJ accorded less than full weight to the records of Dr. Sadek, Dr. Goldstein, and Lisa Giordano without providing a proper explanation as required.  Although I agree with the magistrate judge that the ALJ properly evaluated and weighed the records provided by Giordano, I conclude that the ALJ did not provide a proper basis for according less than full weight to the records of Dr. Sadek and Dr. Goldstein.

The Third Circuit has stated that "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).  Where the opinion of a treating

---

[4]Dr. Goren examined a MRI of Holmes' lumbar spine and wrote a report on September 9, 2003.  (R. 24.)  However, the report fails to indicate when the MRI on which it is based was performed.  (*Id.*)  Dr. Goren reported there "is facet joint osteoarthrosis that is quite prominent on the right" at the L5-S1 disc, which is "slightly desiccated but otherwise normal."  (*Id.*)

physician conflicts with that of a non-treating physician, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429). If the ALJ chooses to reject a treating physician's assessment, the ALJ "may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317-18 (internal quotations omitted); *see also Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988).

**1. Dr. Sadek**

Dr. Sadek, Holmes' treating physician, completed a residual functional capacity statement on May 29, 2003 wherein he provided essentially the same opinion as his previous reports. (R. 42, 517-525.) Dr. Sadek stated that Holmes' pain and fatigue virtually incapacitate her. (*Id*. at 518.) In addition, Dr. Sadek reported that a cervical and lumbar MRI produced positive findings. (*Id*.) Dr. Sadek opined that Holmes needed four hours of rest at unpredictable times throughout a work day as a result of her pain and fatigue. (*Id*. at 521.) Dr. Sadek also opined that Holmes could not stand, could not bend or twist, could not continuously sit for more than twenty minutes, should use a cane for assistance, and should never lift ten pounds or more. (*Id*. at 523.) In conclusion, Dr. Sadek opined that Holmes could not work at all. (*Id*. at 524.)

In rejecting Dr. Sadek's assessment, the ALJ did not rely on the opinion of non-treating physicians. (*See id*. at 42-43.) Without citing any contradictory opinion from a ME or medical report in the record, the ALJ concluded that "[n]either laboratory testing nor clinical observations (including Dr. Sadek's own truncated notes) justify these limitations upon lifting, carrying,

14

walking, and standing." (*Id.* at 42.)  Relying on her own observations, the ALJ discredited Dr.

Sadek's opinions of Holmes' limitations "[b]ecause of their unrealistic nature and the lack of

justification in the medical file." (*Id.*)  By doing so, the ALJ substituted her lay opinion for the

opinion of Dr. Sadek.  Lastly, the ALJ discredited Dr. Sadek's opinion because it was "contrary

to [Holmes'] own self-described activities." (*Id.*)  Because the ALJ may not reject a treating

physician's opinion outright "due to his or her own credibility judgments, speculation or lay

opinion," *Morales*, 225 F.3d at 317-18, I conclude that the ALJ insufficiently described the

reasons (in particular, any contradictory medical evidence) for according less than the full weight

to Dr. Sadek's opinions.

**2.  Dr. Goldstein**

In March of 1999, Dr. Goldstein performed a neurological disability examination and

diagnosed Holmes with "degenerative and bulging discs in the cervical and lumbosacral spine

with resultant back pain, great obesity with resultant back pain, [and] adjustment disorder." (R.

383.)  Dr. Goldstein found that the claimant could lift and carry twenty pounds, and stand for less

than six hours and sit for less than two hours in a workday. (*Id.* at 385.)  As noted in the report

and recommendation, with the exception of the limitations on sitting, the ALJ's residual

functional capacity assessment was actually more restrictive than Dr. Goldstein's opinion. (Rep.

& Recom. 18; R. 42-43.)

The ALJ stated that "I cannot give much weight to his opinion as to her ability to sit for

long periods" because "I am unable to ascertain how he arrived at the limitations upon sitting as

the claimant did not quantify her ability in this area" and "his examination of her was almost

completely normal except for obesity and diminished reflexes." (R. 22.)  As explained above,

these reasons, without more, do not justify rejecting an examining physician's opinion as they substitute the lay opinions of the ALJ for that of the examining physician. Further, the ME at the hearing testified that Dr. Goldstein's functional limitations were consistent with Holmes' complaints and medical findings. (*Id*. at 88.) Notably, the ALJ did not discuss the ME's opinion when discrediting Dr. Goldstein's opinion on Holmes' sitting limitation. Thus, this court concludes that the ALJ did not provide a sufficient basis of contradictory medical evidence for according less than full weight to Dr. Goldstein's opinion.

### 3. Lisa Giordano

Giordano, a physical therapist, performed a functional capacity examination on Holmes in May of 1997. (*Id*.) Giordano opined that Holmes could sit for approximately one hour and stand for approximately fifteen to twenty minutes. (*Id*. at 491.) Giordano reported that Holmes was physically limited secondary to DJD and that she "performed below sedentary level for physical demand characteristics of work, for lifting, carrying and pulling." (*Id*. at 492.) Giordano concluded that Holmes was unable to return to her previous job. (*Id*. at 492.) The ALJ did not accept this conclusion for two reasons. (*Id*. at 42.) First, the ALJ properly found that the therapist was not "an acceptable medical source" listed under 20 C.F.R. § 404.1513(d)(1). (R. 42.) Second, the ALJ discredited the results "in light of [Holmes'] lack of full cooperation during testing." (*Id*.) I conclude that the ALJ provided an adequate basis for according little weight to the examination and report of Giordano.

Therefore, Holmes' objection with regard to the ALJ's evaluation of Giordano's report and opinion is overruled. However, on remand, if the ALJ again determines to accord the opinions of Dr. Sadek and Dr. Goldstein less than full weight, she must provide an adequate

basis for that determination through contradictory medical evidence.

**B. Reliance on Medical Expert's Testimony**

Holmes argues that the ALJ erred by relying on the testimony of the ME, Dr. Askin.

With regard to the ME, the ALJ stated:

> The [ME] testified that he could find no medical differences in her condition between 1996 and now. It was a question of pain tolerance. Her complaints were reasonable in that they might be true. She did not have nonexertional limitations, and he could see no reason why she could not perform sedentary work. He recommended increased activities rather than limitations. In fact, light activity would be better for her if she would do it. Accordingly, I find that the claimant retained the following residual functional capacity: she could lift, carry, push, and pull up to 10 pounds at a time and small objects frequently, walk or stand for up to two hours per workday, and sit for up to six hours per workday so long as she had the option to sit or stand periodically.

(R. 42.) Holmes asserts this demonstrates the ALJ relied on the improper testimony of the ME.

She contends that this testimony is based on an "improper standard of evaluating subjective

symptoms (*i.e.*, the doctor's philosophy about handling pain and motivation)." (Obj.'s to Rep. &

Recom. 3.) Further, Holmes asserts the ME's testimony was improper because, although he did

not dispute Holmes' complaints of pain, he testified that the correct treatment was "not to give in

to it, but you know, work through it, and to overcome it, and to lose weight, instead of staying

this way." (R. 185.) The ME also did not dispute that the limitations Dr. Goldstein enumerated

could reasonably be caused by Holmes' medical history and pain. (*Id*. at 189.) However, from

his perspective as an orthopedic surgeon, the ME stated that "to work through the pain that she's

complaining about would actually make her better, it would be therapeutic." (*Id*. at 186-87.)

Further, the ME testified:

> I don't dispute that she's having pain, and like Mr. Group had asked
> if a coin were on the floor could she bend down and pick it up, [] if
> she says no, I don't doubt it hurts, but by the same token if she did
> bend down and pick it up over time she would make herself better, if
> she did go up and down the steps over time she would make herself
> better... it's like a vicious cycle aspect of it, that from a patient
> management point of view... they just get worst by becoming more–
> basically all she does is sit around and eat I would presume.

(*Id*. at 184-85.)  This court concludes that by relying on the above testimony of the ME, the ALJ, in step four of her decision, improperly assessed Holmes' residual functional capacity.

In making her argument, Holmes relies on *Leslie v. Barnhart*, 304 F. Supp. 2d 623 (M.D. Pa. 2003).  In *Leslie*, the claimant filed for DIB as a result of chronic degenerative disease and herniated or bulging discs.  *Leslie*, 304 F. Supp. 2d at 625.  After a hearing, the ALJ in *Leslie* found "severe impairments, no Listings equivalency, that the plaintiff was not credible as to her pain and that during the relevant period of time she could perform her past relevant work as a reassurance account supervisor."  *Id*. at 628.  The ALJ based his findings on the absence of MRI studies that would account for the disabling pain the claimant alleged, and that testing showed evidence of disc bulging but no herniation.  *Id*.  The ALJ also "stated that 'this opinion is also corroborated by the testimony of the [ME],'" Dr. Askin.  *Id*.  The ME in *Leslie* found no indication from his review of the record that the claimant did not feel the reported pain.  *Id*. at 630.  However, the ME testified:

> Back pain, once you get it, is just a harbinger of having achieved
> middle age and that's it.  Because you have an episode of back that[]
> does not mean that you can't be vigorous.  And if she would be more
> vigorous, if she would push through the discomfort, she would be
> improved by having done so.  And so the problem is that people don't
> want to do that.  They say, you know, if it hurts, I'm not going to do
> it.  And that's why you put limitations on it.  If she, instead of being
> inactive decided to tolerate a certain amount of discomfort in order to

get better, she would make herself better.

*Id*. at 628-29.  The court in *Leslie* correctly stated that "[u]nder the applicable law and

regulations, the first question to pain is whether the objective medical condition could reasonably

produce such pain."  *Id*. at 629.  The court found that the ALJ had replaced this standard with

"one that asks whether the claimant's underlying impairment would be harmed by the exertion of

working."  *Id*.  The court stated that "this is not a prescribed or approved consideration under the

statute or regulations."  *Id*. at 630.  The court found that "Dr. Askin's philosophy about handling

pain and motivation, if it may be accepted as an adequate basis under the guise of '[ME] opinion'

to trump the credibility statements about subjective symptoms of someone with an objectively

established impairment, displaces the statute and Commissioner's regulations."  *Id*.  Thus, the

court remanded the case to the ALJ for reevaluation consistent with its opinion.  *Id*. at 631.

The facts before this court are similar to those in *Leslie*.  Here, the ME, who was also the

ME in *Leslie*, did not dispute Holmes' complaints of pain.  (R. 185.)  The ALJ also did not

dispute that Holmes' medical history and pain could cause her to be limited as Dr. Goldstein

opined.  (*Id*. at 189.)  However, the ME testified that, although she would suffer pain by working,

Holmes' condition would eventually improve by working through that pain.  (*Id*. at 184-85.)  The

ALJ relied on this testimony in determining Holmes' residual functional capacity: "[The ME]

recommended increased activities rather than limitations.  In fact, light activity would be better

for her if she would do it."  (*Id*. at 42.)  While this court agrees with the Commissioner that the

ALJ also assessed Holmes' residual functional capacity by examining the record and medical

evidence (*see id*. at 40-41), it is unclear how much her findings in the decision were influenced

by the ME's improper testimony (*see id*. at 42).  Thus, I will remand this matter to the ALJ for

reevaluation of the ME's testimony consistent with this memorandum and order.

## C. Consideration of Obesity

In her objections, Holmes argues the magistrate judge erred in finding that the ALJ properly evaluated Holmes' obesity in step three and step four of her analysis.  (Obj.'s to Rep. & Recom. 1.)  More specifically, Holmes asserts that "while the [magistrate judge] argues that the ALJ's mere mention and finding of obesity to be a severe impairment suggests an implicit consideration of obesity at the remaining steps... this was never explicitly discussed in this case [at steps three and four] as is required."  (*Id.*)  In support of this assertion, Holmes cites *Demiranda v. Barnhart*, 2005 U.S. Dist. LEXIS 13196 (E.D. Pa. July 5, 2005) (stating that claimant "correctly notes that the Commissioner has issued a ruling... that requires a consideration of obesity at various points in the five-step analysis").  The court concludes that the ALJ properly assessed obesity at step three of her analysis, but not at step four.

The court in *Demiranda* relied on the Third Circuit's decision in *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005).  *Demiranda*, 2005 U.S. Dist. LEXIS 13196, at **2-3.  In *Rutherford*, the Third Circuit held that, while an ALJ must consider impairments a claimant says he or she has, the ALJ's failure to explicitly consider obesity does not require remand where the ALJ has indirectly factored obesity into his or her decision and remand would not change the outcome of the case.  *Rutherford*, 399 F.3d at 552-53 (following *Skarbek v. Barnhart*, 390 F.3d 500 (7th Cir. 2004)).  The Third Circuit determined the ALJ in *Rutherford* had indirectly addressed the claimant's obesity by relying on medical records.  *Rutherford*, 399 F.3d at 553. The court found that because "her doctors must also be viewed as aware of [claimant's] obvious obesity, we find that the ALJ's adoption of their conclusions constitutes satisfaction if indirect

consideration of that condition." *Id.* The district court in *Demiranda* examined *Rutherford* and determined that, although the ALJ relied on medical evidence in which the claimant's obesity was considered, remand was appropriate because the court could not conclude that explicit consideration of obesity would not affect the outcome of the case. *Demiranda*, 2005 U.S. Dist. LEXIS 13196, at **3-4.

Here, with regard to step three of the ALJ's analysis, this court finds that the ALJ explicitly addressed Holmes' obesity. As the report and recommendation notes, the ALJ stated that "if a 'severe' impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis." (R. 38.) The ALJ also stated that a "medically determinable impairment, or combination of impairments is 'severe' if it significantly limits an individual's physical or mental ability to do basic work activities." (*Id*. at 38.) Thereafter, ALJ explicitly found that Holmes' obesity was a severe impairment. (*Id*. at 40.) The ALJ then determined that this severe impairment "did not equal any listings before December 31, 2001." (*Id*.) In making this finding, the ALJ relied on medical records that took into consideration Holmes' obesity. (*Id*.) The ALJ recognized that Holmes' "obesity exacerbated her spinal symptoms," and noted that the ME "testified that, if [Holmes] had knee arthritis, her obesity might equal a listing." (*Id*.) Importantly, the ALJ then found that there was no objective medical evidence of any knee disorder, including arthritis. (*Id*.) The only indications of such disorders were Holmes' subjective claims that she suffered from degenerative joint disease and arthritis of the knees. (*Id*.) Thus, with regard to step three, Holmes' objection is overruled.

With regard to step four of the ALJ's analysis, the ALJ did not explicitly consider Holmes' obesity. Further, this court is unable to conclude that an explicit discussion of Holmes'

obesity at step four would not affect the outcome of this case.  For reasons stated above, the ALJ on remand will already have to reassess Holmes' residual functional capacity.  In doing so, an explicit discussion of Holmes' obesity could or could not affect the ALJ's determination of Holmes' residual functional capacity.  Therefore, I will remand this matter to the ALJ for explicit consideration of Holmes' obesity at step four of the analysis.

**D.  MRI Report Dated September 9, 2003**

Holmes argues that the ALJ erred by not addressing a report of a MRI of Holmes' lumbar spine.  The report was submitted by Dr. Goren and is dated September 9, 2003.  (R. 24.) Notably, the report does not indicate on which date the actual MRI was taken.  (*Id*.)  Holmes asserts that the report shows "positive findings relating to a longstanding impairment, further supporting [her] functional limitations at all times relevant to the ALJ's decision."  (Obj.'s to Rep. & Recom. 5.)  Although the Appeals Council directed the ALJ on remand to address all of the evidence submitted by Holmes with her request for review (R. 428), the ALJ did not do so in her decision.  The Commissioner only argues that because Holmes was required to establish disability prior to December 31, 2001, "evidence of a condition worsening after this date is irrelevant."  (Comm'r Br. Supp. Summ. J. 16 n.5.)

While the Commissioner's argument may have validity, the ALJ did not discuss the September 9, 2003 report whatsoever.  As the Third Circuit has stated, "we need from the ALJ not only an expression of the evidence [she] considered, but also some indication of the evidence which was rejected" in order to determine "if significant probative evidence was not credited or simply ignored."  *Cotter*, 642 F.2d at 705.  Without such information, this court cannot meaningfully review the ALJ's assessment of the September 9, 2003 report.  *See Burnett*, 220

F.3d at 119; *see also Cotter*, 642 F.2d at 705-06.  Therefore, I will remand this matter to the ALJ

for consideration of that report in accordance with the direction of the Appeals Council.  *See*

*Burnett*, 220 F.3d at 120 (directing the district court to remand the case to the ALJ for a

discussion of the evidence and an explanation of reasoning supporting his findings).

**E.  Testimony of Phyllis Wallace**

Holmes objects to the magistrate judge's determination that the ALJ properly evaluated

Wallace's lay testimony.  (Rep. & Recom. 26.)  Holmes argues that "an ALJ must state that a

particular witness is not credible, giving reasons to that witness."  (Obj.'s to Rep. & Recom. 4

(citing *Van Horn v. Schweiker*, 717 F.2d 871 (3d Cir. 1983).)  Holmes asserts that the ALJ erred

by failing to do this with regard to Wallace's testimony.  This court disagrees.  In her decision,

the ALJ stated:

> The claimant's friend testified that she appeared to be in more pain and needed to lie
> down a great deal more in the past two or three years.  Nevertheless, there is no
> medical corroboration of any worsening in the claimant's condition since 2000.
> Furthermore, the two isolated MRIs of her spine do not disclose herniated disks,
> compressed and inflamed nerve roots, vertebral fractures, annular tears, significant
> impingement of the spinal cord, or any other condition capable of causing the
> debilitating pain alleged.  As Dr. Nelson stated, the majority of people have bulging
> discs.

(R. 41.)  Although the ALJ did not explicitly state that she found Wallace's testimony not to be

credible, as the excerpt of the ALJ's decision above shows, that finding is unequivocally implicit

in her decision.  The ALJ provided adequate reasons, including contradictory medical evidence

of Dr. Nelson, for rejecting Wallace's lay testimony.  (*Id.*)  Therefore, because this court

concludes that the ALJ properly evaluated Wallace's testimony in her decision, I will overrule

this objection.

**V. Conclusion**

For the foregoing reasons, I will remand this matter to the ALJ for further proceedings consistent with this memorandum and order.  Specifically, on remand, the ALJ must: 1) provide an adequate basis of contradictory medical evidence if she chooses to accord less than full weight to the opinions of the treating physicians, Dr. Sadek and Dr. Goldstein; 2) apply the proper standard to evaluating Dr. Askin's testimony concerning Holmes' residual functional capacity at step four; 3) explicitly address Holmes' obesity in step four of the analysis; and 4) address Dr. Goren's report dated September 9, 2003 in accordance with the direction of the Appeals Council.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| JOYCE E. HOLMES, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 05-5214 |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

## Order

YOHN, J.

AND NOW, this _____ day of November 2006, upon consideration of the parties' cross-motions for summary judgment (Doc. Nos. 7, 8), and after careful and independent review of the magistrate judge's report and recommendation and the plaintiff's objections thereto, it is hereby ORDERED that:

1. Plaintiff's objections are GRANTED in part.

2. The Report of the magistrate judge is APPROVED except to the extent that I am remanding.

3. The plaintiff's motion for summary judgment is GRANTED to the extent that I am remanding.

4. The motion of defendant for summary judgment is DENIED.

5. The matter is REMANDED to the Commissioner for further proceedings consistent with this memorandum and order.

____ s/ William H. Yohn Jr. ____

William H. Yohn Jr., Judge
